**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DR. REUBEN SETLIFF,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:21-cv-02025-B** |
| | § | |
| **ZOCCAM TECHNOLOGIES, INC.,** | § | |
| *Defendant*. | § | |

## ZOCCAM'S FIRST AMENDED COUNTERCLAIM

Defendant Zoccam Technologies, Inc. ("Zoccam" or "Defendant"), and files this *First Amended Counterclaim* against Plaintiff/Counter-Defendant Reuben Setliff, M.D. ("Setliff"), showing as follows:

### I.
### SUMMARY OF CLAIMS

Setliff has now confessed he was untruthful in making the Settlement Agreement with Zoccam and also obtaining Zoccam stock through the Stock Purchase Confirmation Agreement ("SPA") including Exhibit A thereto. Had Zoccam known about Setliff's material misrepresentations and deceit, there would have been no Zoccam stock for Setliff, no SPA, no Settlement Agreement, and Setliff's lawsuit would not exist.

Compounding Setliff's material misrepresentations is the fact that Setliff does not own the Zoccam stock he is suing under this lawsuit. Therefore, Setliff has no standing to assert the claims he makes in this lawsuit, and he has perpetuated a fraud on Zoccam and this Court.

But even if Setliff did have standing and had not defrauded Zoccam, he still cannot recover. After agreeing to the 2018 Settlement Agreement and SPA (collectively "the Agreements"), Setliff has repudiated their material terms but has retained the benefits from the Agreements, including

occupying a place on the Board of Directors for Zoccam. Further, Setliff has used his position as a Board of Director to advance his own interests at the expense of Zoccam. Undaunted by his own misconduct, misrepresentations (including fraud), and an audio recording with his own words, Setliff seeks to shakedown Zoccam in an effort to advance his own agenda, which is contrary to the Agreements he voluntarily made with Zoccam and others and to Setliff's fiduciary obligations owed to Zoccam. Setliff stands alone – no one supports his deception and shake down strategy – no Board of Director, officer, shareholder, or even his friends.

Zoccam brings counterclaims against Setliff for fraudulent inducement, including the remedy of rescission, breach of contract, common law fraud, fraud by non-disclosure, statutory fraud, promissory estoppel, and breach of fiduciary duties, seeking the remedies of rescission, damages, and/or reformation. Zoccam seeks to put an end to Setliff's shenanigans and outright deception and using his position to advance his own interests to the detriment and damage of Zoccam and the other Zoccam shareholders.

## II.
## PARTIES

1.     Plaintiff/Counter-Defendant Reuben Setliff, a natural person, is a citizen of the State of Colorado and resides and is domiciled there. Doc. 16, ¶ 8. Setliff has appeared herein.

2.     Defendant/Counter-Plaintiff Zoccam is a corporation organized under the laws of the State of Texas maintaining its principal place of business in Dallas, Texas. Zoccam has appeared herein.

## III.
## JURISDICTION AND VENUE

3.     The Court has diversity jurisdiction over Plaintiff's claims against Defendants pursuant to 28 U.S.C. § 1332. Pursuant to *Fed. R. Civ. P.* 13, Zoccam's counterclaims arise out of the same transaction(s) or occurrence(s) that is the subject matter of Plaintiff's claims against

Zoccam. As a result, Zoccam files its counterclaims in the present case. Alternatively and/or concurrently, some or all of Zoccam's counterclaims arise out of matters other than those raised in Plaintiff's claims against Zoccam, and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and are related to the same case and/or controversy pursuant to this Court's original jurisdiction pursuant to Article III of the United States Constitution.

4.    Venue is proper in this District because Plaintiff has judicially admitted venue and his claims were asserted and filed in this particular venue. Moreover, venue is proper because Zoccam's counterclaims are mandatory or permissive with regard to Setliff's live complaint.

## IV.
## CONDITIONS PRECEDENT

5.    Zoccam has complied with all conditions precedent to the extent any exist. Alternatively, any conditions precedent have been waived or excused.

## V.
## FACTUAL BACKGROUND

**A.    Setliff Fails to Get His Story Straight.**

6.    Setliff is a serial litigant who changes his story to conform to his latest self-dealing agenda, even attempting to ignore his own express admissions and agreements that defeat any entitlement to relief. Setliff views a signed contract as the start of negotiations, not the final result of them. For Setliff, litigation is a way to disregard facts, his own admissions, material misrepresentations, and duties and obligations to avoid accountability and instead attempt to extract a resolution through threatening that large legal fees will be incurred if his demands are not met. Setliff admits he is using his lawsuit as a hinderance to Zoccam's success and to prevent a lucrative sale of Zoccam. Setliff demanded a quick mediation take place or Zoccam face the threat of large fees.

7.    Setliff also attempts to feign ignorance or an absence of understanding. Setliff

readily concedes he does not read or care what he signs or agrees to, but claims he relies on his lawyers as if that excuses his material misrepresentations, duties, obligations, and deliberate deceit.

8.      Initially, Setliff has been unable to legally articulate (plead) his claims – this Court having dismissed nearly all of them. Second, truth is not important to Setliff. Setliff first told this Court that he never received or even knew about passthrough losses, did not know Zoccam filed its taxes as a partnership, and that Zoccam and Cook fraudulently concealed these facts. Now, after being outed, Setliff acknowledges and is forced to admit that Zoccam "has purported to pass through losses to shareholders." *Compare* 1st Am. Compl. ¶ 31(a) *with* 2d Am. Compl. ¶ 42(a); *see also* Doc. 35 at 36 & 157 (demonstrating Setliff knew Zoccam passthrough losses and filed tax returns as a partnership). In addition, Setliff alleged that "he and the other members of the Board approved" amending the Certificate of Formation, *see* Doc. 1 ¶ 25, but has now switched to contending he had a temporary loss of competence in voting for amending and was shocked that everyone else had voted to amend. Setliff also now tries to remove himself entirely from his own unequivocal admission by stating that "the Board voted unanimously to begin the process of a restatement . . . but [with] condition[s]" (Doc. 67, 2d Am. Compl. ¶ 44(a)).

9.      At Setliff's recent deposition, Zoccam learned that Setliff made material misrepresentations in order to secure the Agreements from Zoccam. Setliff did not purchase the Zoccam stock the subject of this lawsuit and the Agreements, a trust purchased Zoccam stock and owns Zoccam stock subject of this lawsuit. Furthermore, Setliff admits that he is suing Zoccam because he wants to injure Zoccam, to advance his own personal interests through his position as a Board of Director, and he will always act in his own interest regardless of the fiduciary duties owed to Zoccam.

10.     Setliff's deceit in this litigation is no outlier. Setliff has a judicial history of blatantly

and purposely being untruthful. Truth is an inconvenience to Setliff, even when not a party to the litigation. One court has called Setliff a liar; Justice Gors of the South Dakota Supreme Court wrote: "Dr. Setliff is a liar. He lied to the court. He lied to [a] jury. Under oath." *In re Setliff*, 2002 S.D. 58, ¶ 31, 645 N.W.2d 601, 608 (2002).

**B.      Zoccam and Its Series A Preferred Shares.**

11.      Zoccam provides a proprietary and patented digital application used to close real estate transactions. When Zoccam was created, its CEO, Ashley Cook ("Cook"), was and remains the majority shareholder of its Common Stock and was a minority shareholder of its Series A Preferred Stock when it existed. In 2015, Zoccam filed a Certificate of Formation with the Texas Secretary of State, authorizing 500,000 shares of Series A Preferred Stock and 3,500,000 shares of Common Stock.

12.      Zoccam's initial investors included a group of investors known as the Bold Investors. The Bold Investors held Series A Preferred Stock during the time they were stockholders in Zoccam.  The rights of the Bold Investors associated with their Series A Preferred shares were delineated in Zoccam's 2015 Certificate of Formation ("Bold Investor Rights").

13.      The Bold Investor Rights, as set forth in the 2015 Certificate of Formation, included preferred distribution rights, preferred dividends at 12% annually, redemption rights, and super majority board rights.

14.      Before Setliff became involved with Zoccam, a dispute arose between Zoccam and the Bold Investors that culminated in a 2017 settlement agreement, wherein Zoccam reacquired all Series A Preferred Shares once held by the Bold Investors. The Settlement Agreement between Zoccam and the Bold Investors confirms Zoccam reacquiring the Bold Investor stock, and thus, subject to the terms of the 2015 Certificate of Formation.

15.     Notably, Section 5 of the 2015 Certificate of Formation, titled "Treatment of Redeemed or Otherwise Acquired Shares," dealt with acquirement and provided that any Series A Preferred Stock that Zoccam redeems or otherwise acquired are cancelled and not re-issuable. Section 5 states:

> Any shares of Series A Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries *shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred*. Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Series A Preferred Stock following redemption.

Emphasis supplied.

16.     Section 5, which still exists to this day, made the Series A Preferred Stock and attendant rights once held by the Bold Investors as set forth in the 2015 Certificate of Formation as cancelled, could not and was not reissued, sold, or transferred, including to Setliff. Obviously and logically, Setliff could not and does not possess the Series A Preferred Stock as set forth in the 2015 Certificate of Formation that included the Bold Rights.

**C.     Setliff Becomes Involved With Zoccam.**

17.     From late 2016 through January 2018, Setliff provided some funding to Zoccam. No agreement existed between Setliff and Zoccam regarding how Setliff's voluntary contributions should be characterized, and no formal agreement was ever made between Zoccam and Setliff. Setliff was not provided stock. Eventually, Setliff did purchase Zoccam preferred stock but not any stock with Bold Rights.

18.     Initially, Zoccam was formed as a limited liability company. Each year, Setliff, along with other shareholders, were furnished a K-1 noting that Zoccam was a limited liability partnership, and any losses were passed through to its shareholders.

**D.      Setliff, Through His Counsel, Requested to Change Zoccam's Structure.**

19.      In or around January 2018, Setliff hired Dan and Jo Waller of Glast, Phillips, and Murray ("GPM") to represent him in his dealings with Zoccam.

20.      At this time, Setliff knew that Zoccam desired to raise capital by securing additional shareholders. In order to carry out this objective, Setliff stated that Zoccam would need to make more common stock available for purchase and encouraged Zoccam to do so.

21.      On or around April 16, 2018, Setliff encouraged Zoccam to amend the Certificate of Formation "to convert and eliminate all preferred stock, and to amend the certificate of formation to authorize additional common stock."

22.      To do this, Setliff through Jo Waller, stated in an April 16, 2018 email to Zoccam's then legal counsel that the parties should "agree in principle that they will cooperate to convert and eliminate *all preferred stock*, and to amend the certificate of formation to authorize additional common stock." Setliff, as the instigator of this proposal, was copied on this April 16, 2018 e-mail. Setliff, through his legal counsel, further wrote that this should be done to "seek serious financing, . . . to attract and reward talent . . . to reward Ashley Cook . . . [and] to get [industry stakeholders] engaged with and tied into the company." Setliff further explained that "[e]ventually, whether or not it goes public, [Zoccam] wants to build a shareholder base so at some point there can be liquidity in the stock, and institutional investors can begin to invest."

23.      In the spring 2018, Zoccam and Setliff, through their respective counsel, attempted to negotiate what interests Setliff might have in Zoccam. Zoccam attempted to issue stock certificates to Setliff (none of which included, previously included, or otherwise included Bold Investor Preferred Stock), including in 2017 and 2018, but Setliff declined to accept stock certificates tendered by Zoccam unless and until he obtained numerous confidential documents

from Zoccam. Setliff also demanded he be given rights that did not exist and never had – in particular, he demanded rights under the nonexistent and previously cancelled Bold Investor Preferred Stock. Zoccam consistently and rightly refused to do so and Setliff was well-aware of Zoccam's refusal to do so and why. Zoccam never provided Setliff any basis or reliance that he ever had the Bold Investor Rights, Setliff knew he would not get such rights, never had such rights, and was not entitled to such rights given the 2015 Certificate for Formation, Section 5, and that Setliff and his counsel knew, had copy(ies) of, and were aware of. Setliff wildly claimed he was entitled to Bold Investor rights, but he could not logically, factually, and legally explain why, especially given his insistence the 2015 Certificate of Formation applied.

24.     Ultimately, Zoccam was forced to sue Setliff for his refusal to accept stock certificates, in the 101st District Court of Dallas County, Texas. Recognizing he never had and would never get any Bold Investor Rights or any Series A stock previously acquired and cancelled by Zoccam, or that could include Bold Investor Rights, Setliff entered into the Settlement Agreement and SPA with Zoccam, which now, according to Setliff, is the basis for his present complaint in this Court. Significantly, Setliff did not receive, obtain, or possess stock previously reacquired and cancelled and/or any stock including the Bold Investor Rights. The Settlement Agreement and SPA confirmed same.

**E.     The Settlement Agreement and SPA Define Setliff's Rights and Unambiguously Reflect Setliff's Consent and Admissions.**

25.     On or around May 24, 2018, Setliff and Zoccam (among others) executed the Agreements, which expressly resolved Setliff's rights for Zoccam stock issued to Setliff.

26.     Section 3 of Settlement Agreement, titled "Governance," agreed to and acknowledged by Setliff, states:

The Parties agree that, unless the Parties unanimously agree in writing: (a) there

will be five members on the board of directors (three will be designated by Ashley and two will be designated by Don and Reuben (one each): Don and Reuben will be their own initial designees; (b) the vote per share of Series A preferred stock shall be one vote per share *(i.e.,* as if there were a 1:1 conversion); (c) any new equity capital raised after May 25, 2018 and any changes to the amount of authorized but unissued stock (including without limitation for Norton, Alexander, or existing convertible notes) will dilute all existing shareholders (with Series A preferred stock being treated as 1:1 with common stock: (d) to the extent there are any existing defaults or violations of the Articles relating to Series A Preferred Shares in any way, they are waived or amendments will be made to eliminate such defaults: (e) the Equity Rights Agreement is confirmed as cancelled; (f) and a sale of company or substantially all of the assets of the Company will require the approval of: (x) Ashley: and (y) either Reuben or Don and, if Reuben and Don both vote against a sale proposed by Ashley, then they must buy her out at a sum equal to what she would have received from the proposed transaction (which would include payments on her debt, on her equity, and for any other reason) and, if they cannot close on such a buyout, Reuben and Don will vote in favor of the proposed transaction by Ashley and it will go forward.

27.     Among other things, the Settlement Agreement delineated the defined rights associated that Setliff acquired through the Settlement Agreement and the SPA. These rights are materially inconsistent with the Bold Investor stock reacquired by Zoccam and cancelled pursuant to Section 5 of the 2015 Certificate of Formation. Most notably, that any Preferred Stock be treated as 1:1 with common stock, and likewise, that the Equity Agreement, through which Zoccam issued 500,000 shares of Series A Preferred Stock, reiterates that it "is confirmed as cancelled" and therefore nonexistent and not to be ever reissued. This statement unambiguously and indisputably reinforces and reiterates Section 5 of the 2015 Certificate of Formation, that the reacquired Preferred A Stock with Bold Investor Rights is cancelled and has not and cannot be reissued. Setliff agreed by executing this Agreement.

28.     Section 4.3 of the Settlement Agreement, titled "Entire Agreement," additionally provides that the Settlement Agreement and SPA constitute the entire agreement between the parties, and further states:

This Agreement is being signed and delivered contemporaneously with the issuance

of shares of Series A preferred stock and common stock and related Stock Purchase Confirmation Agreements, which together constitute the entire agreement between the Parties and supersede all prior negotiations, understandings, and agreements[.]

29.    Setliff does not possess or own – and never did possess or own – Series A Preferred Stock that included the rights listed in the 2015 Certificate of Formation.

30.    To carry out and facilitate the Parties' obligations in the Settlement Agreement, Section 4.7 was included, titled "Additional Instruments/Cooperation," and provides as follows:

The Parties to this Agreement agree to cooperate and to execute any and all further documents that may be necessary in order to carry out or effectuate the terms of this Agreement, including without limitation consents, resolutions, or votes as directors or shareholders.

31.    Section 4.7 unambiguously proclaims the Parties' express intent, based on the statements of Setliff that an amendment would be undertaken, "to convert and eliminate all preferred stock, and to amend the certificate of formation to authorize additional stock." By agreeing to this provision, Setliff admitted the Zoccam stock he owned was common stock only.

32.    Because of the material representations and considerations reflected in the Agreements including the intent of the Agreements, Zoccam agreed to and executed the Agreements in reasonable, justifiable, and/or substantial reliance on Setliff's promises and material representations, including that Setliff was purchasing Zoccam stock with his own funds, Setliff was the individual owner of the Zoccam stock, that Jill Berg has no rights or ownership in the Zoccam stock and that she had been repaid any funds furnished for Zoccam stock, that he would perform under Section 4.7, that he would "cooperate to convert and eliminate *all preferred stock*, and to amend the certificate of formation to authorize additional common stock" so that Zoccam could "seek serious financing, . . . attract and reward talent . . . reward Ashley Cook . . . [and] get [industry stakeholders] engaged with and tied into the company." But for these representations by Setliff, Zoccam would not have entered into the Agreements or amended Zoccam's Certificate of

Formation.

33.     Zoccam executed the Agreements and amended its Certificate of Formation, relying upon Setliff's admission and agreement that rights associated with any Preferred Shares were solely those unambiguously delineated as common stock in Section 3 of the Settlement Agreement and in the SPA and that it was Setliff who was purchasing Zoccam stock for his own individual benefit and not on behalf of someone else or another entity.

34.     At the same time Setliff executed the Settlement Agreement, Setliff also executed the SPA that contained Exhibit A, which is Setliff's Investment Representation Statement, where he represented to Zoccam that:

1.      *The Company may rely on these representations*.  I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2.      *I am purchasing for investment*.  I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse.  I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares.   My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3.      *I can protect my own interests*. I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4.      *I am informed about the Company*. I am sufficiently aware of the

Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had an opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5.      *I recognize my economic risk.* I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6.      *I know that the shares are restricted securities.* I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

> a.      I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);
> b.      the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*
> c.      the certificate evidencing the shares will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7.      *I am familiar with Rule 144.* I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and may depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than a specified period after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company (A) the sale being made in an unsolicited "broker's transaction", transactions directly with a market maker or riskless principal transactions, as those terms are defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, *and* (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8.      *I know that Rule 144 may never be available.* I understand that the requirements of Rule 144 may never be met, and that the shares may never the saleable under the rule. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's stock upon which to make such

a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which may preclude me from selling the shares under Rule 144 even if the relevant holding period had been satisfied.

9.      *I know that I am subject to farther restrictions on resale*. I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may or may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale; (ii) my providing an opinion of my counsel to the effect that such sale will not require registration; and (iii) the Company notifying me in writing that it or its counsel concurs in which opinion, which concurrence shall not be unreasonably withheld. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10.      *I know that I may have tax liability due to the uncertain value of the shares*. I understand that the Board of Directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service may successfully assert that the value of the shares on the date of my purchase is substantially greater than the Board's appraisal. I understand that any additional value ascribed to the shares by such an IRS determination will constitute ordinary income to me as of the purchase date, and that any additional taxes and interest due as a result will be my sole responsibility payable only by me, and that the Company need not and will not reimburse me for that tax liability.

11.      *Residence*. The address of my principal residence is set forth below.

12.      *Jill Berg*.   Certain of the cash advanced to the Company for the Purchase Price was wired by Jill Berg ("Berg") at my request. I reimbursed Berg for those funds. I will promptly provide the Company  a writing signed by Berg in a form acceptable to the Company  confirming  that: (a) she was reimbursed for the funds she sent or caused  to be sent to the Company;  (b) she does not and will not claims any rights, titles, or interests in such funds or in the Shares which are being issued to me or in or to any securities of the Company; and (c) She holds no claims or cause of action against the Company or any other person or entity with respect to such funds.

By signing below, I acknowledge my agreement with each of the statements contained in this Investment Representation Statement as of the dates set forth in the Stock Purchase Confirmation Agreement above, and my intent for the Company

to rely on such statements in issuing the shares to me.

*See* Exhibit A to the SPA, executed by Setliff in May 2018.

35.     These representations are material representations relied on by Zoccam to sell and/or issue Zoccam stock to Setliff as well as enter into the SPA and Settlement Agreement which, as Setliff has admitted, are considered together.

36.     Setliff agreed to be bound by the SPA when he signed it. Setliff also signed and agreed to be bound by Exhibit A, the Investment Representative Statement. By their very nature, these representations were material given Setliff's unambiguous acknowledgment that Zoccam was relying on each in, at minimum, selling and selling Setliff Zoccam stock.

37.     On the SPA through Exhibit A thereto, Setliff agreed to provide documentation regarding Berg and her funding of Zoccam stock, and Zoccam relied on Setliff's promise to do so in selling and issuing him shares of Zoccam stock and making the SPA and Settlement Agreement. However, Setliff never furnished Zoccam documentation that Berg forwarded funds to Setliff and he paid her back, and that Berg had no interest or rights to any Zoccam stock.

38.     Setliff, in acknowledging all terms of the Agreements and accepting the benefits therefrom, was made member of Zoccam's Board of Directors with all such responsibilities and duties to Zoccam that accompany such position. Setliff continues to maintain his Board position while repudiating the material terms to the Agreements, admitting he defrauded Zoccam to obtain the Agreements to be a Board of Director (*see* subsection J) and engaging in self-dealing by, among other things, using his Board of Director position to advance his personal interests.

**F.     Setliff's Actions Disavow Any Claim of Having Any Stock with Bold Rights.**

39.     In accordance with the Agreements, Zoccam held a board meeting in or around November 2018 to discuss amending its Certificate of Formation, consistent with Setliff's desire

since May 2018 and the terms of the Agreements executed to by Setliff. A Board Agenda leading up to the October 2018 Board Meeting listed multiple reasons why the 2015 Certificate of Formation should be amended, including that it was "overly complicated," it was "[i]mplemented when the company envisioned actually using a preferred stock structure" that "hasn't been used and is unnecessary." It further stated the 2015 Certificate of Formation should be amended to "simplify [Zoccam's Certificate of Formation] as much as possible" and "[d]elete preferred stock; for preferred shareholders, convert into common stock."

40.     During the November 2018 Board Meeting, Setliff made his "motion to convert Preferred shares to common." Thereafter, during this meeting, Zoccam's Board, *including Setliff*, unanimously voted in favor of the Motion. The Board "*unanimously* voted to approve the amendment of the certificate of formation but the amendment of the certificate of formation does not affect the settlement agreement between . . . [Setliff] and [Cook]."

41.     During a subsequent Board meeting in November 2020, Zoccam's Board of Directors – including Setliff – unanimously ratified the Restated Certificate of Formation filed in 2019. This Restated Certificate of Formation amended the prior Certificate of Formation to effectuate the items covered by the Settlement Agreement, including that the Preferred Stock shall be treated "as if there were a 1:1 conversion" with common stock. The Restated Certificate of Formation filed in 2019 and the Board's vote ratifying same effectuated Setliff's request that the parties "cooperate to convert and eliminate *all preferred stock*, and to amend the certificate of formation to authorize additional common stock." The Board's vote and action were documented in a resolution that all Board of Directors signed, except Setliff, though his signature was unnecessary and his vote was audio recorded and could be not properly withdrawn in accordance with applicable law.

42.     Apparently recognizing his agreements, statements, and votes would defeat his shake down effort, Setliff concocted a number of frivolous and false excuses for not signing the resolution relating to the November 2020 Board of Directors meeting. Among other things, Setliff claimed pass-through losses to shareholders were not disclosed and therefore Setliff was misled in his November 2020 vote. Setliff's excuses all centered on his own claimed interests, not as a Board of Director owing fiduciary obligations to Zoccam.

43.     Setliff knew Zoccam had pass-through losses to its shareholders – including him – before Setliff voted to ratify the Restated Certificate of Formation and before Zoccam filed the Amended Certificate of Formation in 2019.[1]

44.     Setliff also claimed he had a temporary loss of reason during the November 2020 meeting but of course Setliff has acknowledged he did vote in favor of ratification.

45.     Setliff's pretextual excuses are no match for the truth and the Restated Certificate of Formation authorized and ratified by the Board was consistent with Setliff's rights in the Settlement Agreement. Through the Restated Certificate of Formation, the Board never authorized and did not discuss any notion that Setliff ever possessed or would possess the Bold Investor Rights or similar. Setliff's claim to such rights, including through his position as a Board of Director, is verifiably false. The Board never authorized and did not discuss the possibility that Setliff possessed any Bold Investor Rights or similar because Setliff did not, could not, and does not possess such rights. Setliff voluntarily agreed to and executed the Agreements, and one clear result

---

[1] For example, on September 7, 2018, Setliff received a draft of Zoccam's 2017 tax return, showing him as receiving partnership losses. Five days later, on September 12, 2018, Setliff received his 2017 Schedule K-1 showing his share of "Ordinary business income (loss)" was a loss. On September 15, 2017, Setliff received from Zoccam amended 2015 and 2016 "U.S. Return[s] of Partnership Income" showing losses and confirming that Zoccam filed partnership tax returns. And, on September 5, 2017, Setliff participated in a meeting with Zoccam and its accountant and tax preparer concerning the refiling of Zoccam's 2015 and 2016 tax returns as a partnership. Thus, Setliff knew that Zoccam filed partnership tax returns over 1 year before the November 2018 Board Meeting. He likewise knew or should have known of his own pass-through losses at least two months before this Board Meeting.

was the elimination of Preferred Stock which Setliff agreed to, and which never included the Bold Investor Rights or similar.

**G.      Zoccam and Setliff Worked to Help Draft a Document Consistent With the Board's Decision to Amend.**

46.      After Setliff consented to and executed the Agreements, Setliff worked with Zoccam, through its then-legal counsel, to draft a form amendment for the Certificate of Formation. Drafts were exchanged, including on December 18 and 26, 2018, and January 21 and February 5, 2019.

47.      On January 21, 2019, Setliff emailed Zoccam a document titled "Restatement Certificate of Formation." This document did not mention the previously cancelled Preferred Shares and/or any attendant rights that were cancelled previously. The January 21 document was the last form of amendment to the Certificate of Formation that Zoccam received from Setliff.

48.      On February 5, 2019, Zoccam emailed Setliff an updated "Restated Certificate of Formation" that likewise did not identify, mention, or, of course, resurrect the previously cancelled Preferred Stock and/or any attendant rights. However, this document reiterated and confirmed all Zoccam shares are Common, and "all of the shares of common stock shall have identical rights to distribution and liquidation proceeds."

49.      On February 21, 2019, Dan Waller of GPM emailed Zoccam's counsel a proposed resolution directing attention to "paragraph 3 regarding preferred dividends." That Paragraph 3 stated all outstanding shares of Preferred Stock "will be converted into common stock with no dividend or distribution preference[.]" This email obviously reflects and confirms there was no preferred stock, and thus, no rights including Bold Rights associated with any preferred stock.

50.     Discussions between Setliff and Zoccam regarding finalizing the form of amendment to the certificate of formation appeared to have ceased by late February 2019.  Setliff declined to meaningfully contribute to further drafting.

51.     On March 31, 2019, Setliff reconfirmed his consent to the Agreements by emailing Zoccam's Chief Operating Officer stating, "[t]he provisions of the Settlement Agreement, notwithstanding the changing of Preferred to Common, shall remain operative in corporate documents."

**H.      The Filed Restated Certificate of Formation Embodies the Parties' Intent to Eliminate All Preferred Shares to Raise Funding.**

52.     Zoccam, indisputably, did not agree, indicate, or imply that Setliff's February 5th proposed draft amendment would be the precise document filed with the Texas Secretary of State. Although Setliff declined to cooperate with any further drafting of the Amendment, he did reconfirm his consent to the Agreements.

53.     In accordance with the Agreements, on or around August 28, 2019, Zoccam submitted its Restated Certificate of Formation to the Texas Secretary of State. The Texas Secretary of State issued a Certificate of Filing "Effective: 08/29/2019."

54.     The Restated Certificate of Formation is consistent with the Settlement Agreement, the SPA, and the November 2018 Board Meeting and Director vote, did not resurrect the canceled Series A Preferred stock including Bold Investor Rights or similar, but instead reconfirmed cancellation of such stock and any attendant rights found in in Section 3 of the Settlement Agreement.

**I.      Setliff Breached the Agreements.**

55.     After the Amendment was filed and effective, Setliff complained, through an August 29, 2019 e-mail, that Zoccam's filing "is not the version agreed to by . . . Dr. Reuben

Setliff" and that the February 5th document constituted "our agreement." Later that day, Setliff informed Zoccam that the February 5th document "is what was agreed upon" and what "[w]e asked for several months . . . be filed to reflect our agreement." As part of this e-mail, Setliff included the February 5, 2019 email with the proposed document.

56.     Tellingly, what Setliff contends he "agreed upon" did not contain *any* Preferred Stock and/or any attendant rights including the previously reacquired and cancelled Series A Preferred Stock and all attendant rights including Bold Investor Stock. When Setliff emailed Zoccam on August 29, 2019, with his complaints to the Restated Certificate of Formation that was filed and which the Secretary of State accepted, no complaint or objection was made concerning the elimination of Preferred Stock and any attendant rights, including the cancelled Series A Preferred Stock as well as any Bold Investor Rights. Logically and obviously, Setliff knew Preferred Stock and any attendant rights had been eliminated, including previously cancelled stock, and Setliff acknowledged and agreed to same when he executed both Agreements.

57.     Nevertheless, Setliff has persisted in his position that the Restated Certificate of Formation filed in 2019 should be rescinded, and the 2015 Certificate of Formation should be reinstated, despite Setliff's reconfirmation of the Agreements, the existence of Section 5 to the 2015 Certificate of Formation, Setliff's repeated acknowledgments of the specific terms of the Agreements, and his retention of the benefits in both Agreements (including being a Zoccam Board of Director).

58.     On or around November 19, 2020, Zoccam approved a Motion and Resolution to Ratify the 2019 Restated Certificate of Formation (the "Ratification"). The Ratification was joined by, among others, Cook and Don Schellpfeffer/Pocket MD, LLC. Setliff voted in favor of ratification but did not sign the Ratification, claiming a temporary lapse in sanity, but the Board

did not need his signature for any enforceable and valid ratification.

59.     Setliff's decision to not sign the Resolution for the Amendment, after voting for it as a Board of Director, stemmed from his designed choice to place his personal interests in Zoccam above Zoccam and Zoccam's interests, financial health, and to honor his words and execution of the Agreements. Given Setliff's personal interests and placing those interests over those of Zoccam, Setliff should have recused himself as a Board of Director on this issue. Indeed, the only other people besides Setliff who possessed any Preferred Shares before the Amendment's passage – Cook and Schellpfeffer – each also a Director of Zoccam – signed the Ratification. By their votes, the Directors, even without Setliff, obviously confirmed the elimination of the Preferred Stock and any attendant rights and that any preferred stock with Bold Investor Rights remained cancelled and not transferred or sold as part of Zoccam's continued and future success.

60.     Setliff's refusal to sign the Resolution for the Restated Certificate of Formation further violated his promise in Section 4.7 "to cooperate and to execute any and all further documents needed to carry out or effectuate the terms of this [Settlement] Agreement," including "consents, resolutions, or votes as directors of shareholders." Doing so also breached his fiduciary duties as a Zoccam Board of Director.

61.     In further reliance on Setliff's statements and position, Zoccam – a startup with at most three employees – on boarded over ten investors with the understanding that no Series A Preferred Shares or attendant rights exist – all of whom are on an equal footing through a 1:1 structure established by Class A and Class B Common Stock. And again, Setliff was provided a seat on the Board of Directors in reliance of his consent and execution of the Agreements.

**J.      Setliff's Deposition is Taken and Setliff's Fraud and Breaches Are Exposed**

62.     On November 29, 2022, Setliff's deposition was taken and his frauds, breaches, lying, and purposeful disregard for his obligations were exposed.

63.     Setliff admitted in his deposition that he did not buy Zoccam stock for his own interests but used funds from the Reuben Setliff Living Trust to pay for Zoccam stock and it was the Trust who owned all or part of the Zoccam stock obtained.

64.     Setliff also admitted he did not and does not intend to comply with his obligations under the Settlement Agreement and SPA.

65.     Significantly, Setliff represented in Exhibit A to the SPA that the statements he made were true, and that Zoccam was relying on them; yet Setliff knew his representations were false and/or recklessly made and his false representations were made to induce Zoccam to issue him Zoccam stock. Had Zoccam known the truth, there would have been no stock issued to Setliff. Setliff's material misrepresentations were intended to have Zoccam issue him stock knowing the truth would have prevented Setliff from obtaining Zoccam stock and the benefit of the Settlement Agreement.

66.     Setliff also revealed that he had no intent in honoring the Agreements, particularly providing documentation regarding the source of funds to obtain the Zoccam stock including from Jill Berg, Setliff's longtime significant other, but not spouse.

67.     Setliff further revealed he intended to advance and has advanced his own personal interests through his position as a Board of Director in direct contravention of his fiduciary obligations.

68.     Setliff also acknowledged he was intending to damage and harm Zoccam and those interests were superior to his fiduciary obligations as a Zoccam Board of Director. Setliff made clear his own personal interests would take precedence over his obligations as a Board of Director.

69.     Setliff also subsequently disclosed he was sharing confidential Zoccam information with third parties including Daniel Veltkamp in breach of his obligations to Zoccam.

70.     Setliff's deposition testimony further revealed Setliff has a callous disregard for the Agreements he executed, his obligations thereunder and as a Zoccam Board of Director, and that being untruthful has no consequences for him.

71.     Had Zoccam known that Setliff's material representations were false, recklessly made, and/or untruthful including Setliff did not acquire Zoccam stock for his own use, trust funds were used for purchase Zoccam stock, and a trust owned the Zoccam stock, there would have been no Agreements and Setliff would not have been sold Zoccam stock as well as permitted a position as a Zoccam Board of Director. Further, had Zoccam known that Setliff disregarded and refused to abide by the Agreements' other terms and representations including Setliff's duty to cooperate and disclaimers of reliance, Zoccam would not have entered into the Agreements.

72.     Finally, Setliff, as a Zoccam Board of Director with fiduciary obligations to Zoccam, did not disclose that his representations and promises in the Agreements were false and inaccurate. As a fiduciary duty to Zoccam, Setliff had a duty of candor and disclosure to Zoccam. Further, Setliff's material misrepresentations mislead Zoccam and left Zoccam with misleading material information that Setliff was obligated to correct.

## CAUSES OF ACTION

### VI.
### FRAUDULENT INDUCEMENT

73.     Zoccam incorporates Paragraphs 1-72 as if fully set out herein.

74.      Setliff fraudulently induced Zoccam to agree and execute the two Agreements and including selling stock to Setliff and allowing Setliff to be a Board of Director without an intent to fully perform and/or making material representations that Setliff intended Zoccam to rely upon. In particular, Setliff made multiple material representations to Zoccam at or before the Agreements were executed including, but not limited to: (1) the representations made by Setliff in the SPA and Exhibit A thereto were true and Zoccam was relying on same to issue Zoccam stock; (2) the purchase of Zoccam stock was for Setliff individually and not for anyone else; (3) the funds for purchase of the Zoccam stock came from Setliff's personal and/or individual funds and not from another source; (4) to the extent funds to purchase the Zoccam stock came from Jill Berg, Setliff reimbursed her and she disclaims any interest and rights for the Zoccam stock; (5) Setliff will furnish documentation to Zoccam to substantiate No. 4 above; (6) Setliff was relying exclusively on his own counsel and admissions and not any representations of Zoccam or its agents including counsel; (7) Setliff was fully informed about Zoccam; (8) Setliff may have tax liability because of purchasing Zoccam shares; (9) the Agreements include all material terms and any representations and there are no others (Paragraph 4.3 of the Settlement Agreement); (10) Setliff would cooperate in carrying out the Agreements, including amending the 2015 Certificate of Formation; (11) Setliff was releasing all claims and any that could arise in the future "relating to events that occurred prior to the Effective Date as reflected in Paragraph 2.1 of the Settlement Agreement;" (12) how Preferred Stock would be treated (Part III – Governance); and (13) in exchange for being truthful regarding all material representations, promises, and Setliff's duties and obligations in the Agreements, he would be allowed a seat on the Board of Directors. Each of his representations were false or recklessly made, as demonstrated by Setliff's subsequent conduct and/or Setliff's own statements including his recent deposition. Setliff knew these representations were false as

well as others including in Exhibit A to the SPA and he did not intend to abide by the terms of the Agreements. Setliff admits his representations were false. Setliff would have no Zoccam stock had he truthfully provided accurate information and/or answered/disclosed the truth regarding the representations made in the Agreements including the SPA and Exhibit A thereto. Setliff has also substantiated fraudulent inducement by Setliff suing Zoccam for claims that Setliff did not have, do not exist, and/or were released and also attempted to shakedown Zoccam by pursing meritless claims and making false claims resulting in Zoccam expending fees and costs to deplete Zoccam's financial resources.

75.     Setliff made these false and reckless representations with the intent that Zoccam act on them, including consenting to the Agreements, selling Setliff Zoccam stock, permitting Setliff a seat on the Board of Directors, bringing in additional shareholders, believing all disputes between Setliff and Zoccam had been resolved, and devoting financial and personnel resources and expenses to carry out the Agreements. Zoccam reasonably relied on and acted on Setliff's representations and promises, which has now caused Zoccam damages and/or injuries and/or entitles Zoccam to rescission. As reflected in the Agreements, Zoccam reasonably and justifiably relied on Setliff's representations and promises in the Agreements to its detriment and to induce Zoccam to enter into the Agreements.

76.     Setliff also had no intent to perform his duties and obligations pursuant to the Agreements but instead defrauded Zoccam, including permitting Setliff to purchase Zoccam stock, agreeing and permitting Setliff to be a Board of Director for Zoccam, having Zoccam obtain additional shareholders, and/or claiming he was entitled to the Bold Investors Rights when the Agreements reflected no such rights. Setliff had no intent to perform under the Agreements but instead obtain the benefits thereunder and then advance his own personal interests as a Board of

Director.

77.     As a consequence, Zoccam is entitled to rescission and/or damages – actual, consequential, compensatory, and/or exemplary.

## VII.
## COMMON LAW FRAUD

78.     Zoccam incorporates Paragraphs 1-77 as is fully set out herein.

79.     Setliff made material misrepresentations in the Agreements, including Exhibit A to the SPA, which Setliff knew to be false and/or were recklessly made. In particular, Setliff represented: (1) the representations made by Setliff in the SPA and Exhibit A thereto were true and Setliff acknowledged Zoccam was relying on same for entering into the Agreements; (2) the purchase of Zoccam stock was for Setliff individually and not for anyone else; (3) the funds for purchase of the Zoccam stock came from Setliff's personal and/or individual funds and not from another source; (4) Setliff owns the Zoccam stock and not any other person or entity (5) the funds to purchase the Zoccam stock came from Jill Berg, and Setliff has reimbursed her and she disclaims any interest and rights for the Zoccam stock; (6) Setliff will furnish documentation to Zoccam to substantiate No. 4 above; (7) Setliff was relying exclusively on his own counsel and advisors and not any representations of Zoccam or its agents including counsel; (8) Setliff was fully informed about Zoccam; (9) Setliff may have tax liability because of purchasing Zoccam shares; (10) the Agreements include all material terms and any representations and there are no others (Paragraph 4.3 of the Settlement Agreement); (11) Setliff would cooperate in carrying out the Agreements, including amending the 2015 Certificate of Formation; and (12) Setliff was releasing all claims and any that could arise in the future "relating to events that occurred prior to the Effective Date as reflected in Paragraph 2.1 of the Settlement Agreement," which would obviously include no Series A Preferred Stock that allegedly would include Bold Investor Rights; (13) how Preferred

Stock would be treated (Part III – Governance) by Setliff and Zoccam.

80.     Setliff intended for Zoccam to reasonably rely on these material misrepresentations to Zoccam's detriment and Zoccam did so rely. In particular, the Agreements included material misrepresentations that stated that Zoccam was relying on same in entering into the Agreements. By the very terms of the Agreements, Zoccam reasonably relied on these material misrepresentations in making and executing the Agreements including allowing Setliff to purchase Zoccam stock and Setliff to be a Zoccam Board of Director.

81.     Zoccam suffered injury and damages as a result of Setliff's fraud including entering into the Agreements, allowing Setliff to be a Zoccam stockholder and Board of Director, the costs and expense of this litigation, taking on additional investors, and the costs and expenses for carrying out the terms of the Agreements.

82.     As a result, Zoccam is entitled to rescission and/or damages including exemplary damages.

## XIII.
## FRAUD BY NON-DISCLOSURE

83.     Zoccam incorporates Paragraphs 1-82 as is fully set out herein.

84.     Setliff has and continues to have a duty of disclosure to Zoccam as a consequence of the Agreements and as a Zoccam Board of Director. Setliff breached his duty of disclosure to Zoccam by not disclosing his representations and promises to Zoccam including in the Agreements and as a Zoccam Board of Director were false and/or recklessly made.

85.     Setliff knew Zoccam was ignorant of the facts and particularly the falsity of the representations and promises Setliff made to Zoccam in the Agreements such as the trust owning the Zoccam stock, the stock being purchased with trust funds, and that Setliff did not intend to fulfill his obligations under the Agreements such as duty to cooperate and disclaimers of reliance.

Alternatively and/or concurrently, Setliff remained silent despite an obligation to speak. Alternatively and/or concurrently, Setliff made partial disclosures which he knew were misleading and/or learned his disclosures were no longer true. In particular, Setliff's representations and promises in the Agreements required Setliff to speak truthfully and/or correct any partial disclosures that were misleading or no longer true. This includes the Agreements such as Exhibit A to the SPA, that Setliff was relying on representations or promises not in the Agreements and were expressly disclaimed, that Setliff was not relying solely on his counsel and advisors, that Setliff would not cooperate to carry out the Agreements, that Setliff was the only owner of Zoccam stock and only his personal funds were being used to purchase Zoccam stock, that Zoccam should not rely on Setliff's representations and promises in the Agreements and the Zoccam stock, that Setliff had not conducted his own due diligence with regard to the Agreements, and that as a Zoccam Board of Director, he would not fulfill his fiduciary duties and obligations.

86.     Setliff's silence and/or failure to cure misleading statements or statements not true was intended to induce Zoccam into the Agreements. Zoccam reasonably and/or justifiably relied on Setliff's duty of disclosure and to be truthful and accurate in Setliff's dealings with Zoccam including the Agreements and as a Zoccam Board of Director. Setliff's refusal to disclose has caused Zoccam injury, damages including exemplary damages, and entitlement to rescission.

**IX.**
**STATUTORY FRAUD PURSUANT TEX. BUS. & COM. CODE § 27.01(a)**

87.     Zoccam incorporates Paragraphs 1-86 as is fully set out herein.

88.     Setliff's conduct, silence, misrepresentations, and fraud is also actionable pursuant to *Tex. Bus. & Comm. Code* § 27.01.

89.     Setliff sought to purchase Zoccam stock and was sold and issued Zoccam stock based on Setliff's admitted material misrepresentations including Setliff's promises and

representations in the Agreements, that the representations therein were truthful and accurate such as Setliff was purchasing stock individually with his own funds, Setliff was the individual and only owner of the Zoccam stock, the Zoccam stock was not being held for another, Jill Berg had no rights or entitlement to Zoccam stock and Setliff had repaid Berg, Setliff was not relying on any statements, representations, and information from Zoccam in entering into the Agreements, and Setliff had conducted his own due diligence regarding Zoccam. Zoccam was induced into the Agreements including the Zoccam stock transaction based on Setliff's material misrepresentations as reflected above. Zoccam justifiably relied on Setliff's material misrepresentations to its detriment and would not have entered into any stock transaction with Setliff had Zoccam known the truth.

90.    Setliff benefited from the purchase of Zoccam stock through his statutory fraud by becoming a purported Zoccam stockholder, by becoming Zoccam Board of Director, putting his interests over that of Zoccam, being the beneficiary of a promissory note payable by Zoccam with substantial interest, and by purchasing Zoccam stock for or on behalf of another

91.    As a consequence of Setliff's statutory fraud, Zoccam is entitled to rescission and/or damages including the expenses and fees related to this litigation, fees and expenses to obtain rescission of the Agreements, the expenses spent toward carrying out the Agreements, reasonable attorney's fees, costs of any expert witnesses, and other litigation costs.

**X.**
**BREACH OF CONTRACT – SETTLEMENT AGREEMENT AND SPA**

92.    Zoccam incorporates Paragraphs 1-91 as if fully set out herein.

93.    The Settlement Agreement and SPA constitute valid and enforceable contracts between Setliff and Zoccam.

94.     Zoccam fully performed under the Settlement Agreement and the SPA and/or has been excused from performing by Setliff's fraud and prior material breach.

95.     Setliff materially breached the Settlement Agreement and SPA by: (1) misrepresenting material facts that he was required to affirm in making the Agreements which are a material part of the Agreements including Exhibit A to the SPA; (2) failing to "agree to cooperate and to execute any and all further documents that may be necessary in order to carry out or effectuate the terms of this Agreement, including without limitation consents, resolutions, or votes as directors or shareholders," as he promised and is obligated under Section 4.7 of the Settlement Agreement; (3) by failing to furnish the information required in Paragraph 12 of Exhibit A of the SPA; and (4) by suing Zoccam for claims and issues released and/or based on Setliff's material misrepresentations. Such material breaches specifically include Setliff's failure to sign the Ratification of 2019 Certificate of Formation, and his insistence that the Series A Preferred Shares and/or the Series A Preferred Stock previously cancelled, along with any rights such as the Bold Investor Rights, existed and/or the Certificate of Formation was not amended to authorize additional common stock.

96.     Providing truthful information and representations in the Agreements were material terms to the Agreements and Setliff's failure to do so is a material breach of the Agreements. Failure to provide information regarding Jill Berg in Paragraph 12 of Exhibit A to the SPA is likewise a material term to the Agreements. Further, cooperating to carry out the Agreement such as amending Zoccam's 2015 Certificate of Formation, the Amendment, and the Restatement were material terms to carry out or effectuate the terms of the Settlement Agreement, specifically Section 4.7, as well as the SPA.

97.     Additionally, Setliff's attempts to rely upon the 2015 Certificate of Formation to

renege on an action that he proposed, consented to, voted for, obtained benefit as a result, and helped effectuate constitutes a failure "to cooperate" in violation of Section 4.7 of the Settlement Agreement. Specifically, Section 5 of the 2015 Certificate of Formation explicitly forbids Setliff from obtaining the Bold Investor Rights that Zoccam reacquired, and all cancelled shares associated with them.

98.     Setliff has also breached the Agreements by failing to abide by the terms of these Agreements including, but not limited to, receiving Zoccam stock under false pretenses through fraud and/or deceit and instituting a lawsuit, thereby materially repudiating the terms of the two Agreements. Among other terms, Setliff also agreed to release all claims: "Each of the Parties hereby release, waive, discharge, hold harmless, and acquit the other Parties and those Parties' Affiliates from any Causes of Action that any of the Parties has or had as of the Effective Date or could have in the future relating to events that occurred prior to the Effective Date," but Setliff nevertheless sued Zoccam and Ashley Cook for claims and/or allegations that Setliff released. Setliff has also based his claims in his lawsuit on representations and any other statements previously disclaimed and the Agreements reflect the parties' complete agreements and that Setliff has conducted his own investigation and diligence when he had not.

99.     Setliff's material breaches excused any performance by Zoccam and/or the terms and/or any benefits to Zoccam.

100.    Zoccam has been harmed as a proximate result of Setliff's breaches, including Setliff becoming a Zoccam stockholder and Board of Director, and actual and consequential damages (including lost corporate opportunities and lost profits) it has expended as a result of Setliff's material breaches by repudiating the Agreement terms in an amount exceeding the minimal jurisdictional limit of this Court. This includes all damages and expenses resulting from

Setliff's material misrepresentations and/or refusal to abide by the Agreements he signed and other damages flowing from benefits Setliff has received from the Agreements. Zoccam also seeks and is entitled to pre- and post-judgment interest at the highest rate permitted by contract and/or available by law.

101.    Zoccam further seeks and is entitled to its reasonable and necessary attorneys' fees outside of actual damages from and against Setliff, pursuant to *Tex. Civ. Prac. & Rem. Code* § 38.001 *et seq*.

102.    Additionally and/or alternatively as the law permits, Zoccam requests that the Court rescind the Settlement Agreement and return the parties to their earlier positions as if no Settlement Agreement had existed. Zoccam is ready, willing, and able, and hereby offers to restore the consideration Setliff paid through and under the Settlement Agreement and SPA, particularly the amount of $200,000 for so-called Preferred Stock. Zoccam hereby seeks restoration of the consideration provided to Setliff. Zoccam requests that the Court rescind the Settlement Agreement so that the parties may return to their earlier status as if no Settlement Agreement and SPA existed.

## XI.
## PROMISSORY ESTOPPEL

103.    Zoccam incorporates Paragraphs 1-102 as if fully set out herein.

104.    Additionally and/or alternatively, Setliff made definite promises and representations, both orally and in writing, to Zoccam that he would abide by the Agreements, including providing truthful and accurate representations and/or cooperation to effectuate necessary actions including an amendment to Zoccam's 2015 Certificate of Formation for the purposes of carrying out the Agreements, eliminating all preferred stock and any rights thereunder (and validating all cancelled stock and rights remain and are cancelled), and to authorize additional

common stock. Among other things, Setliff affirmed his representations in the Agreements were true and accurate and were being relied on by Zoccam and encouraged and agreed that Zoccam should amend the 2015 Certificate of Formation "to convert and eliminate all preferred stock, and to amend the certificate of formation to authorize additional common stock." Setliff agreed and urged the parties to "agree in principle that they will cooperate to convert and eliminate all preferred stock, and to amend the certificate of formation to authorize additional common stock."

105.    As part of and in exchange for agreeing and receiving Zoccam stock and the terms in the Agreements and to cooperate and fully consent to the Agreements, Setliff was provided certain rights or benefits, including appointment to the Zoccam Board of Directors. Setliff accepted these benefits or rights without reservation or qualification. This right or benefit was a material term of the Agreements and not severable from either Agreement. By accepting this benefit or right and continuing to remain a Board of Director, Setliff is estopped from repudiating his duties and obligations in the Agreements, including making truthful and accurate representations in the Agreements, owing a duty of candor to Zoccam, fulfilling Setliff's fiduciary obligations as a Zoccam Board of Director, making demands and/or claims plainly inconsistent with the Agreements and Setliff's obligations and duties under the Agreements, as well as advancing his own interests ahead of Zoccam.

106.    Zoccam reasonably and substantially relied on Setliff's promises and representations in the Agreements to its detriment when it properly proceeded with the Agreements, to amend the 2015 Certificate of Formation, filed the Amendment, and later ratified the Amendment, including through the November 2020 Board meeting and Setliff's agreement and consent as well as all expenses and fees related thereto. Setliff has repudiated his obligations and duties to provide truthful and accurate representations in the Agreements, and to cooperate,

but nevertheless, has accepted and taken advantage of the terms of the Agreements through the present. Through this lawsuit, Setliff claims his consents, resolutions and/or votes as a Board of Director or shareholder are needed to effectuate Zoccam's governance, yet he has repudiated his duties and obligations under the Agreements to cooperate ad fulfill his fiduciary obligations. Setliff cannot have it both ways – receiving and retaining the benefits of the Agreements while concurrently rejecting his corresponding duties and obligations, which were a material parts of the terms and/or consideration for the Agreements.

107.    Furthermore, Zoccam took on additional shareholders (as Setliff promoted and insisted) as a result of amending its Certificate of Formation. Zoccam did so relying upon and with the understanding that no Series A Preferred Shares or attendant rights existed – only Class A and Class B Common Stock existed with the same equal footing.

108.    Zoccam's reliance was both reasonable and foreseeable by Setliff, as evidenced by the extensive communications occurring between Setliff and Zoccam, and the terms of the Agreements, both before and after the amendment, including the statements and representations Setliff made, his execution of the Agreements and the representations therein, the acceptance of the benefits Setliff received from the Agreements, and Setliff's participation in drafting the form of the amendment to the Certificate of Formation.

109.    Injustice can be avoided only by enforcing Setliff's promises and material representations and rescinding the Agreements and/or deeming the 2015 Certificate of Formation amended, the Amendment and Ratification effective, and rejecting Setliff's objections and claims.

110.    Zoccam has incurred reliance damages as a proximate result of Setliff's representations and promises and the two Agreements. These specifically include all costs incurred by Zoccam in this litigation in dealing with Setliff's various claims and allegations, onboarding its

investors, effectuating the Amendment and Ratification, and in defending against Setliff's claims in his meritless lawsuit, which contradicts his material representations, consent, and acceptance to the Agreements.

111.    Zoccam also seeks and is entitled to its reasonable and necessary attorneys' fees from and against Setliff.

## XII.
## BREACH OF FIDUCIARY DUTY

112.    Zoccam incorporates Paragraphs 1-111 as is fully set out herein.

113.    Setliff is a fiduciary to Zoccam and has breached his fiduciary obligations to Zoccam. In particular, Setliff is a Zoccam Board of Director who must, at all times, act with the best interests of Zoccam and not for Setliff's own personal interests and/or engage in self-dealing.

114.    As a Zoccam Board of Director, Setliff had a duty of full disclosure to Zoccam and not act and/or to promote Setliff's own interests. Yet, Setliff obtained Zoccam stock and a seat on the Zoccam Board of Directors based on material misrepresentations which he did not disclose to Zoccam. For example and not by way of limitation, Setliff purchased Zoccam stock through third party funds, a trust, and Setliff admits it is the trust who owns Zoccam stock, not Setliff. As a fiduciary, Setliff was required to make full disclosure to Zoccam relating to the Agreements, the ownership of Zoccam stock, and the funds used to obtain Zoccam stock. These facts are material and reflect on Setliff's position as a Zoccam Board of Director and the rights, remedies, and best interests of Zoccam.

115.    Setliff has also breached his fiduciary obligations and duties to Zoccam by engaging in self-dealing and advancing his personal interests over the best interests of Zoccam. Setliff uses his Board of Director position to obstruct, delay, cause Zoccam expense, and advance his own personal interests including his own lawsuit agenda. Setliff's votes, positions, statements,

and communications as a Board of Director are exclusively directed to Setliff's personal interests and are advance to Zoccam's interests. Setliff refuses to disqualify himself as a Zoccam Board of Director, at least on matters where Setliff has a direct personal interest. Setliff's conduct in advancing his own personal interests (which Setliff admits) are breaches of fiduciary duties.

116.    Setliff also acted solely for his own interests disregarding his duties of loyalty and candor to Zoccam, causing Zoccam damages including legal fees and expenses, obstruction, interference, refusal to cooperate, lost business opportunities, and dealing with Setliff's lawsuit. Setliff admits his intent is to injure Zoccam.

117.    Setliff has acted solely in his own interests contrary to his duties and obligations as a Zoccam Board of Director, causing Zoccam damages through Setliff's obstruction, interference, deceit, refusal to cooperate, and legal fees in this lawsuit.

## XIII.
## RESCISSION

118.    Zoccam incorporates Paragraphs 1-117 as fully set out herein.

119.    Additionally and/or alternatively, Zoccam requests the Court to rescind the Settlement Agreement and SPA and return Zoccam and Setliff to their earlier position as if no Settlement Agreement and SPA had existed.

120.    Zoccam is entitled to rescission due to Setliff's admitted fraudulent inducement, material misrepresentations, and/or material breaches of the Settlement Agreement and the SPA as described herein. Zoccam is also entitled to rescission including Setliff as a Board of Director as well as all special damages and expenses. By not making these disclosures, Setliff breached his fiduciary obligations to Zoccam.

121.    Further, in the extremely unlikely event it is determined that Setliff owns Preferred Shares and/or that the attendant rights of those shares include Bold Investor Rights, the basis of

such determination necessarily entails that both Zoccam and Setliff proceeded under a mistaken fact and misperception that Preferred Stock and attendant rights once held by the Bold Investors could be reissued, sold, or transferred to Setliff, contrary to Section 5 of the 2015 Certificate of Formation and other grounds, when in actuality, they could not be. Zoccam is therefore entitled to rescission based on such circumstances.

122. In the alternative, Zoccam has since refused the benefits of the Settlement Agreement and the SPA upon learning of the mistake.

123. As described above, Zoccam is ready, willing, and able, and hereby offers to restore the consideration Setliff paid for Preferred Stock through and under the Settlement Agreement and SPA, which amount is $200,000. Accordingly, Zoccam hereby seeks restoration of the consideration and rescission.

124. No adequate remedy at law exists to correct the mutual mistake made by Setliff and Zoccam. Zoccam also seeks recovery of any special damage or expense it reasonably incurred as a result of any mutual mistake regarding the Settlement Agreement and SPA.

125. Zoccam acted and continues to act with clean hands in its dealings with Setliff and Setliff continues to perpetuate his frauds and breaches of fiduciary duties on Zoccam.

126. Accordingly, Zoccam requests that the Court rescind the Settlement Agreement so that the parties may return to their earlier status as if no Settlement Agreement and SPA existed.

## XIV.
## REFORMATION

127. Zoccam incorporates Paragraphs 1-126 as is fully set out herein.

128. Additionally and/or alternatively, Zoccam seeks reformation of the Settlement Agreement and SPA.

129. In the unlikely event it is determined that Setliff has any enforceable rights under

the Agreements including Preferred Shares and/or that the attendant rights of those shares could ever be Bold Investor Rights, the basis of such determination necessarily entails that both Zoccam and Setliff proceeded under the mistaken fact that the Preferred Stock and attendant rights once held by the Bold Investors could be reissued, sold, or transferred to Setliff, when in actuality, they could not be pursuant to Section 5 of the 2015 Certificate of Formation and all other grounds. Under such circumstance and scenario, Zoccam and Setliff expressly intended for Setliff to have a total of 200,000 shares of Zoccam's issued common stock. Further, both Zoccam and Setliff overlooked and acted under the same misunderstanding of the same material fact; namely, that the Preferred Stock and attendant rights once held by the Bold Investors could be reissued, sold, or transferred to Setliff, when in actuality, they could not be.

130.    Zoccam seeks reformation of the Settlement Agreement by declaring the Agreements null and void particularly if Setliff's representations in the Agreements are false and/or removing from the SPA Section 1: "(which were reacquired by the Company in a transaction with the previous holders of such shares)."

131.    Zoccam further requests the SPA be reformed to include the following sentence where the deletion in paragraph 132 took place: "( such stock not being the Bold Investor stock previously reacquired and cancelled pursuant to Section 5 of the 2015 Certificate of Formation by the Company and such stock not conferring any rights or benefits the same as or similar to Bold Investor stock)."

132.    Zoccam has acted and continues to act with clean hands in its dealings with Setliff.

133.    Accordingly, Zoccam requests the Court to reform the Settlement Agreement and the SPA as reflected herein.

## XV.
## DAMAGES

134.    Zoccam seeks all damages to which it is entitled. Such damages include actual, compensatory, consequential, and exemplary. Setliff's conduct with regard to his fraud, as described in Paragraphs 71-89, represent entitlement to such damages pursuant to *Tex. Civ. Prac. & Rem. Code* § 41.003(a)(1), otherwise known as exemplary damages. Zoccam also seeks pre- and post- judgment interest as permitted by law.

## XVI.
## ATTORNEYS' FEES

135.    Zoccam seeks and is entitled to recover its reasonable and necessary attorneys' fees and expenses it has incurred and will incur in enforcing its rights and remedies against Setliff, including pursuant to *Tex. Civ. Prac. & Rem. Code* § 38.001, rescission, and/or on its promissory estoppel claim. Zoccam seeks all fees through trial, any appellate and collection proceedings, and as otherwise permitted by law. Zoccam has complied with any requirements and/or conditions to obtain such fees.

## XVII.
## JURY DEMAND

136.    Zoccam hereby demands a trial by jury for all issues so triable.

## XVIII.
## PRAYER FOR RELIEF

Zoccam respectfully requests the Court to enter judgment that Setliff take nothing by way of his claims and to award Zoccam the following relief:

a.    Judgment against Setliff:

b.    Alternatively or concurrently, actual damages, including full contract damages;

c.     As the law permits, rescission, reformation, or cancellation of the Settlement Agreement and SPA as applicable;

d.     Alternatively or concurrently, consequential, special, and exemplary damages

e.     Reasonable and necessary attorneys' fees and expenses and court costs as prayed for;

f.     Pre-and post-judgment interest at the maximum rate agreed by the parties or permitted by law; and

g.     Such other and further relief, at law and/or in equity, to which Zoccam may be justly entitled.

Respectfully submitted,

**LAW OFFICE OF MARK A. TICER**

By: */s/ Mark A. Ticer*
        Mark A. Ticer
        State Bar No. 20018900
        Jennifer W. Johnson
        State Bar No. 24060029

        10440 North Central Expressway, Suite 600
        Dallas, Texas 75231
        (214) 219-4220 (Telephone)
        (214) 219-4218 (Facsimile)
        mticer@ticerlaw.com
        jjohnson@ticerlaw.com

*ATTORNEYS FOR DEFENDANT ZOCCAM TECHNOLOGIES, INC.*

**CERTIFICATE OF SERVICE**

A true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on December 21, 2022.

*/s/ Mark A. Ticer*
        Mark A. Ticer